This is an appeal from a judgment of the Lucas County Court of Common Pleas entered on April 28, 1997 in which the court accepted jury verdicts finding appellant, Marlan M. Mitchell, guilty of aggravated murder with a specification that it was premeditated or that appellant was the principal offender, and with a firearm specification, and guilty of kidnaping with a firearm specification. In the same judgment entry, the trial court sentenced appellant to life with possibility of parole after thirty full years for aggravated murder, three years for the firearm specifications to be served prior to and consecutive with the life sentence, and to ten to twenty-five years for kidnaping, to be served consecutive with the life sentence and with the three year sentence for the firearm specifications. Appellant is also appealing from a judgment entry filed on July 9, 1997, in which the trial court denied his motion for a new trial.
Appellant has presented five assignments of error for consideration that are:
"First Assignment of Error:
 THE TRIAL COURT ERRED TO APPELLANT'S PREJUDICE WHEN IT PERMITTED SAMMIE OWENS, OVER OBJECTION, TO TESTIFY THAT APPELLANT WAS A DRUG DEALER. (TR 1294-1295.)
"Second Assignment of Error:
 THE TRIAL COURT ERRED TO APPELLANT'S PREJUDICE WHEN IT PERMITTED DETECTIVE HAROLD MOSLEY, OVER OBJECTION, TO TESTIFY TO PREJUDICIAL SPECULATION. (TR 1396-1399.)
"Third Assignment of Error:
 THE TRIAL COURT WRONGLY DENIED APPELLANT'S MOTION FOR NEW TRIAL.
"Fourth Assignment of Error:
 APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL DID NOT OBJECT TO THE STATE'S CALLING LEATHA MITCHELL AS A WITNESS.
"Fifth Assignment of Error:
 THE TRIAL COURT WRONGLY DENIED APPELLANT'S REQUEST TO INSTRUCT THE JURY TO DRAW NO INFERENCES FROM THE FACT THAT CERTAIN WITNESSES INVOKED THEIR RIGHTS UNDER THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION."
Before we address the arguments presented in support of or in opposition to the assignments of error, we will review the facts and procedure in this case.
The record shows that the grand jury sitting in Lucas County, Ohio filed an indictment against appellant in the Lucas County Court of Common Pleas on May 10, 1996. The first count in the indictment charged appellant with aggravated murder, a violation of R.C. 2903.01(B). Two specifications were listed with the first count: a specification that the murder was committed while the victim was being kidnaped or that appellant was the principal offender or that the murder was premeditated; and a specification that appellant had a firearm in his possession or control when the crime was committed.
The second count in the indictment contained a charge that appellant committed kidnaping, a violation of R.C. 2903.01(B). A specification was listed with the second count, that appellant had a firearm in his possession or control when he committed the crime.
Appellant entered not guilty pleas to the charges, and the case proceeded to trial. At trial, the state presented witnesses who testified that on April 16, 1996, just after midnight, a shooting and kidnaping took place at an apartment building in Toledo, Ohio. Three witnesses who were present when the events happened, including appellant's grandfather, a relative of the victim, and appellant's acquaintance who was convicted in a separate trial of involuntary manslaughter and kidnaping on the basis of the same events now discussed, testified that appellant was the person who shot the victim, dragged the victim down three flights of stairs, and put the victim in the trunk of appellant's grandparent's car. The exact sequence of events described by the witnesses was as follows.
Appellant asked his grandparents to give him a ride to pick up his vehicle. They agreed, and went along as passengers in their own car while appellant drove. Appellant saw an acquaintance outside an apartment building in Toledo, Ohio, and pulled over to talk with him. Appellant and his grandparents got out of the car and went inside the building with the acquaintance. Appellant's grandfather testified he had poor health and lagged behind the others while they climbed three flights of stairs. While he was still climbing the stairs, he heard some shots. He kept going up the stairs so he could see if anyone in his group was hurt.
Appellant's acquaintance testified that appellant asked him to take appellant to see the victim. The acquaintance said he had been smoking crack cocaine and spending time with the victim since early that morning, and he knew that the victim was in an apartment on the third floor. He led appellant and appellant's grandmother to the apartment and knocked on the door.
A woman inside the apartment opened the door, and the victim was standing in a hallway just inside the door. When the victim saw appellant, he said something to the effect of he gave the money to appellant's mother earlier that day. Appellant swore, pointed a gun at the victim and shot him twice. The victim turned and ran into the apartment, and appellant followed him.
The acquaintance and a relative of the victim testified that appellant shot the victim two more times inside the apartment. The acquaintance testified appellant then dragged the victim down three flights of stairs by his shirt collar. The victim was crying out that he was dying.
The victim's relative ran down a fire escape and got into his car. He was visiting from out-of-town, but remembered there was a hospital nearby. He decided to drive to the hospital to get help from the security officers. As he was backing his car out of a parking lot, he saw appellant and his acquaintance putting the victim into the trunk of a car.
The grandfather and the acquaintance testified that after appellant dragged the victim outside to the car, he discovered his grandfather had locked the keys to the car inside the car. He smashed the back window out of the car, opened the trunk, loaded the victim inside the trunk and got into the driver's seat. His acquaintance sat in the back seat, and his grandmother sat on the passenger side of the front seat. His grandfather got into the back seat of the car, and appellant drove away.
Appellant's grandfather and his acquaintance testified that appellant drove the car to an alley, where another vehicle with its lights on pulled in behind the car. Appellant and his acquaintance got out of the car and removed the victim from the trunk. The acquaintance testified the victim was still alive. He said appellant arranged for a woman to drive him home, so he left appellant and appellant's grandparents at the alley.
Appellant's grandfather testified appellant then told him he and his wife could leave. He drove his car to his home, and was stopped by police who wanted to know what happened to the back window of his car. He told the officers it had to be smashed because he locked his keys in the car. He did not tell them about the shooting and kidnaping he just witnessed.
Shortly after midnight, several uniformed officers and detectives from the Toledo Police Department responded to a broadcast that there had been a shooting and a kidnaping at an apartment complex. The victim's relative had reached the hospital, and security guards there called the police.
At first, the police could not find the location of the shooting and kidnaping, but after some officers went to the hospital and picked up the victim's relative, he led them to the apartment building. When they walked up to the building, they found a trail of blood that went from the sidewalk to an apartment door on the third floor. They knocked on the door and found a hysterical woman and a man who claimed he was sleeping on the couch through everything that happened inside the apartment. They also found spent shells from fired bullets and blood stains. They learned the name of appellant's acquaintance and learned that he lived in an apartment on the first floor of the building.
Some detectives went to the acquaintance's apartment to talk with him, but he was not home. They returned to the apartment shortly after one a.m. and found he had returned. He agreed to go with them to the police station to answer questions. He did not admit any involvement in the shooting or kidnaping and gave only a vague description of the person he said committed the crimes.
The woman who found the victim's burial site testified that she was awakened by a dog barking around two-thirty in the morning on April 16, 1996. She got up and looked out her bedroom window, but she could not see anything, so she went back to bed. The dog kept barking for several hours.
When the woman went out later that day to put her garbage cans by the curb for pick-up, she noticed an area between her house and a vacant house next door where the dirt had been disturbed. She went inside and called the police to report what she saw.
Officers from the Toledo Police Department responded to her call, and after minimal digging, they uncovered a human foot. The officers called the coroner. The coroner arrived and began helping the police officers and detectives to dig. As they dug, they discovered the victim's body, buried in a shallow grave and partially encased in concrete that had not yet completely hardened. They cleared the body of all the concrete and removed it from the grave.
The coroner testified that the victim had been shot four times and had been rendered a paraplegic or a quadriplegic by one bullet that grazed his spine. In addition, the victim was severely beaten before he was buried. Both of his jaws were broken, and several of his teeth were displaced. The coroner said the damage to the victim's face was too extensive to have been done with a human hand. The coroner also said the victim lost a great deal of blood in the shallow grave, and had dirt in his nasal passages and in his lungs. The coroner concluded that the victim was still alive when he was buried. His blood pressure pumped his blood from his body into the grave after he was buried and he breathed dirt into his lungs before he died of suffocation. The coroner said the victim would have survived his injuries if he had received medical treatment.
Several days after the shooting and kidnaping happened, appellant's acquaintance admitted to a Toledo Police Detective that he knew more information, and he named appellant as the perpetrator. The victim's relative identified appellant from a photo line-up the detective prepared. Appellant was then indicted and arrested for the crimes.
In support of his first assignment of error, appellant argues that he was prejudiced when the trial court permitted his acquaintance to testify at trial that appellant was a drug dealer. Appellant says the information should have been excluded from evidence as irrelevant, pursuant to Evid.R. 402, as more prejudicial than probative, pursuant to Evid.R. 403(A), or as evidence of other crimes used "to prove the character of a person in order to show that he acted in conformity therewith" pursuant to Evid.R. 404(B). Appellant says the testimony given by his acquaintance was not reliable. He says his acquaintance was not believable because his acquaintance had himself been convicted of crimes associated with the same events, but claimed he was convicted of "false charges". In addition, his acquaintance admitted he had repeatedly lied to the police about these events. Finally, his acquaintance testified that he never purchased any drugs from appellant, so appellant argues the witness had no personal knowledge to support his testimony that appellant sold drugs.
The Supreme Court of Ohio has ruled: "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. Therefore, this court will not reverse the ruling of a trial court regarding the admission or exclusion of evidence unless the trial court abused its discretion. An abuse of discretion "connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v. Adams (1980), 62 Ohio St.2d 151,157. Keeping this standard in mind, we have reviewed and rejected each of appellant's arguments, and have decided that the trial court did not abuse its discretion when it admitted the disputed evidence.
First, the testimony was relevant, as the state aptly pointed out at trial, because it helped show the motive appellant had for committing the crimes for which he was on trial. The testimony also helped show that appellant had some prior calculation and design to commit the crime, which was relevant to a specification added to the murder charge. The evidence showed that the victim used drugs, and that when the victim saw appellant standing in the hallway outside the apartment his first words were that he gave the money to appellant's mother earlier that day. This evidence supports the belief that the motive for the crime was a dispute over a drug deal.
Second, even assuming arguendo that the evidence was more prejudicial than probative pursuant to Evid.R. 403 or that it could not be introduced because it did not sufficiently establish motive, pursuant to Evid.R. 404(B), we find that any error in the admission of this testimony was harmless beyond a reasonable doubt. The remaining evidence at trial provided overwhelming proof of appellant's guilt regarding the kidnaping and murder of the victim and appellant was not prejudiced by the testimony that he was a drug dealer. See State v. Sage, 31 Ohio St.3d at 181.
Finally, the arguments that the witness was not reliable go to the weight of the testimony. The jury was fully informed of the witness's lies to the police and of his own criminal convictions. The jury, as the trier of fact, was therefore able to determine the credibility of the witness and the weight to assign the testimony in question. See State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. Appellant's first assignment of error is not well-taken.
Appellant's second and third assignments of error are interrelated and will be considered together. In support of his second assignment of error, appellant argues that the trial court erred when it permitted one of the detectives who investigated the crime to testify that he believed the boyfriend of appellant's sister, who lived five houses away from the burial site, was in the construction business. In support of his third assignment of error, appellant argues that the trial court should have granted his motion for a new trial that he supported with affidavits from his sister showing the detective's belief was false.
Appellant says the trial court erred when it admitted the testimony in question because it was speculative. He says that when the requirements of Evid.R. 602 are applied, it becomes clear the testimony should have been excluded.
The testimony in dispute was as follows:
"Q And did you witness the exhumation of that grave?
"A Yes, I did.
" * * *
 "Q I'd like to ask you, now, you said that the location was 1102 Woodstock, is that correct?
"A That's correct.
 "Q Are you familiar with an individual by the name of a Pamela Mitchell?
"A Yes, I am.
"Q And how are you familiar with that person?
"A She is a relative of the Defendant.
"Q And do you know where Pamela lives?
"A 1128 Woodstock.
 "Q And how far is that from 1102 Woodstock, if you know?
 "A Approximately five houses, on the same side of the street.
"Q Do you know who Pamela Mitchell lives there with?
 "A I believe she lives there with her son, a live-in boyfriend — maybe two sons and a live-in boyfriend.
 "Q Do you know what the boyfriend's name is, by any chance?
"A I believe his last name is —
"MR. GEUDTNER: Objection, relevance.
"THE COURT: Go on.
"MR. SORG: I'm sorry?
"THE COURT: Go on. Objection is overruled.
"Q Are you okay?
"A Yes.
"Q You were saying? I'm sorry.
"A His last name is Hayes, I believe.
"Q Do you know what he does?
"A I believe he's in light construction.
 "MR. GEUDTNER: Objection. If he doesn't know for sure, he can't testify to what he believes, Your Honor.
 "MR. SORG: Your Honor, maybe we can rephrase it. I think he's trying to say —
"MR. GEUDTNER: May we approach the Bench?
"(Discussion was had at the Bench as follows:)
 "MR. GEUDTNER: The witness has indicated that apparently he has no firm knowledge. He's about to testify to what is speculation on his part, and that's not going to be admissible, I don't think.
"THE COURT: Where are you going?
 "MR. SORG: The boyfriend's business is construction, subcontracting. This victim's buried five houses away from that location and there's cement used at the burial site. It's a relative of the Defendant.
 "MR. GEUDTNER: Purely speculative, Your Honor. And apparently the witness has no genuine personal knowledge. As I say, he began his statement with `I believe.'
 "THE COURT: What you're talking about is fertile ground for cross examination.
 "MR. GEUDTNER: Well, we'd also object to the relevancy, Your Honor. Again, like I say, this is purely speculative.
 "THE COURT: Prosecutor's pointed out the relevancy. I'll let you proceed.
"(End of discussion at the Bench.)
 "Q I'm sorry, Detective Moseley. We were speaking before, and I asked you if you know what the boyfriend — the live-in boyfriend of Pamela Mitchell does for a living?
 "A I believe he did light construction work or was some type of handyman.
 "MR. GEUDTNER: Objection, Your Honor. Move to strike as to what his belief is.
"THE COURT: Overruled."
Once again, this court's standard of review for a challenge to a trial court's decision to admit or exclude evidence is an abuse of discretion. State v. Sage, 31 Ohio St.3d at paragraph two of the syllabus. We cannot say that the trial court abused its discretion when it admitted the testimony in question.
The trial court correctly noted that appellant could cross-examine the detective to determine the basis of the detective's beliefs. Likewise, the defendant could call a rebuttal witness to show the detective was mistaken in his belief. Finally, the remaining evidence presented at trial provided overwhelming proof of appellant's guilt, and any error associated with the admission of this testimony was harmless. Even assuming that the belief of the detective that appellant's sister lived with a man who worked in construction and who had concrete stored at her house was wrong, the remaining evidence still established that appellant was the person who shot the victim, dragged the victim down three flights of stairs, loaded the victim into a car trunk, unloaded the victim from that same car trunk in an alley not far from the spot where the victim's grave was discovered the next day, and was the last person seen with the victim before the victim was discovered dead and buried.
Just as the standard of review for the admission or exclusion of evidence is an abuse of discretion, this court will not reverse the ruling of a trial court on a motion for a new trial filed pursuant to Crim.R. 33 absent an abuse of discretion.State v. Schiebel (1990), 55 Ohio St.3d 71, paragraph one of the syllabus. Appellant argued that he was prejudiced and prevented from having a fair trial when the trial court permitted the detective to testify, over appellant's objection, that he believed the live-in boyfriend of appellant's sister worked in construction or home repair. He cited Crim.R. 33 (A)(1), (3), (5) and (6) as the basis for his motion and attached an affidavit from his sister in which she averred the detective had misidentified her boyfriend, that her boyfriend did not work in construction or home repair, and that no concrete mix was stored at her house.
Once again, we cannot find that the trial court abused its discretion when it denied appellant's motion for a new trial. We have already discussed that appellant was not prejudiced or prevented from having a fair trial when the trial court admitted the disputed testimony from the detective; therefore, appellant could not demonstrate the basis found in Crim.R. 33(A)(1). In addition, appellant failed to demonstrate accident or surprise which could not be guarded against with ordinary prudence, so he did not establish the basis found in Crim.R. 33(A)(3). Likewise, appellant did not show error that occurred at trial or that the evidence he presented in the affidavit attached to his motion could not have been discovered and produced at trial even when he used reasonable diligence. Accordingly, appellant did not meet the requirements of Crim.R. 33(A)(5) or (6).
Because the trial court did not abuse its discretion when it admitted the detective's testimony, appellant's second assignment of error is not well-taken. Appellant's third assignment of error is also not well-taken because the trial court did not abuse its discretion when it denied his motion for a new trial.
In support of his fourth assignment of error, appellant argues that his grandmother should not have been allowed to take the stand when she was called as a state witness, because the court and counsel knew ahead of time that she would invoke herFifth Amendment rights. Appellant also argues that because his trial counsel did not raise any objection to his grandmother taking the stand, they provided him with ineffective assistance of counsel.
The Supreme Court of Ohio has ruled:
 "2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. (State v. Lytle
[1976], 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623; Strickland v. Washington [1984], 466 U.S. 668, followed.)
 "3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley (1989), 42 Ohio St.3d 136-137, paragraphs two and three of the syllabus.
Keeping this standard of review in mind, we have considered appellant's arguments. For the following reasons, we conclude that appellant did not receive ineffective assistance of counsel in this case.
First, we agree with the state that the decision of appellant's trial counsel not to object to the state calling appellant's grandmother to the stand or to her taking herFifth Amendment privilege in front of the jury was a sound trial tactic. The Supreme Court of the United States set the standard for deciding if ineffective assistance of counsel was provided to a defendant. Strickland v. Washington (1984), 466 U.S. 668. The court was careful to explain that great deference should be given by courts scrutinizing trial counsel's representation. The court said:
 "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. * * * A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under certain circumstances, the challenged action `might be considered sound trial strategy.'" Id. at 689 (citations omitted).
In the case at bar, while the trial court arguably had the right to prevent the state from calling his grandmother to the stand in its case because she informed all counsel and the court ahead of time she would assert her Fifth Amendment rights, seeState v. Kirk (1995), 72 Ohio St.3d 564, and the trial court arguably had the right to prevent appellant from calling his grandmother as a witness on his behalf because she told all counsel and the court ahead of time that she would continue to claim her rights, see id. the decision of appellant's counsel to waive that right was a valid trial tactic. Because they allowed appellant's grandmother to take the stand in front of the jury to assert her Fifth Amendment rights, trial counsel was able to argue to the jury that appellant's grandmother might indeed be the guilty party, rather than appellant.
Second, even if we were to assume arguendo that the failure of appellant's trial counsel to object when his grandmother was called by the state as a witness fell below an objective standard of reasonable representation, we agree with the state that appellant failed to show that his case was prejudiced. Indeed, as we have already noted, the effect of the challenged event was to establish a second likely suspect for the crimes — appellant's grandmother could only claim her Fifth Amendment rights if her testimony would implicate herself as a guilty party to a crime. Accordingly, appellant's fourth assignment of error is not well-taken.
In support of his fifth assignment of error, appellant argues that his case was prejudiced when the trial court refused to give the jury instruction he requested telling the jury not to draw any inferences from his grandmother's act of claiming herFifth Amendment rights in this case. Appellant says the Supreme Court of Ohio has already clearly ruled that such an instruction is required under circumstances like those that existed in his case.
The Supreme Court case appellant relies upon is State v. Kirk
(1995), 72 Ohio St.3d 564. In that case, a defendant wanted to call a witness as part of his defense, even though the witness made it clear to the court and to counsel that the witness would claim the protection of the Fifth Amendment right not to incriminate oneself. The trial court excused the witness from responsibility to answer a subpoena and the defendant appealed. On appeal, the Supreme Court ruled that the trial court did not err when it refused to permit the defendant to call the witness who was claiming Fifth Amendment rights. In syllabus rulings, the court said:
 "1. A trial court may exclude a person from appearing as a witness on behalf of a criminal defendant at trial if the court determines that the witness will not offer any testimony, but merely intends to assert the Fifth Amendment privilege against self-incrimination. (Columbus v. Cooper [1990], 49 Ohio St.3d 42, 550 N.E.2d 937, distinguished and limited.)
 "2. Where a defendant is not entitled to call a witness to the stand because of the witness' intention to assert the Fifth Amendment privilege against self-incrimination, the defendant is entitled to request an instruction that the jury should draw no inference from the absence of the witness because the witness was not available to either side." Id. at paragraphs one and two of the syllabus.
We agree with the state that the above case is distinguishable from the case at bar. In this case, the trial court allowed both the state and appellant to call appellant's grandmother to the stand. Therefore, the trial court did not completely exclude the witness from appearing on appellant's behalf, and it follows that the appellant was not absolutely entitled to an instruction to the jury that no inference should be drawn from the absence of the witness.
We also agree with the state that under the circumstances of this case, appellant was not prejudiced by the absence of the requested jury instruction, because any inferences to be drawn from the witness's assertion of her Fifth Amendment rights were inferences that she was herself culpable for the charged crimes. The inferences were in appellant's favor; therefore, we fail to find any prejudice to appellant even if we assumearguendo that the trial court erred when it refused to give the requested instruction. Accordingly, appellant's fifth assignment of error is not well-taken.
After considering all the assignments of error and reviewing the record, we conclude that appellant was not prejudiced or prevented from having a fair trial. The judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the court costs of this appeal.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Peter M. Handwork, P.J._____ _______________________________ JUDGE
Richard W. Knepper, J.______ _______________________________ JUDGE
Mark L. Pietrykowski, J.____ _______________________________ JUDGE CONCUR.